IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CABOT OIL & GAS CORPORATION,
a foreign Corporation,

        Plaintiff,

v.                                CIVIL ACTION NO. 3:09-0955

DAUGHERTY PETROLEUM, INC.,
a Kentucky Corporation,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Plaintiff's Motion for Partial Summary Judgment (Doc. 76), Defendant's Motion for Summary Judgment (Doc. 79), Defendant's Motion in Limine Regarding Liquidated Damages (Doc. 94), and Defendant's Motion to Strike Jury Demand (Doc. 98). For the following reasons, Plaintiff's motion is **DENIED**, Defendant's motion for summary judgment is **GRANTED**, and Defendant's motion in limine and motion to strike jury demand are **DENIED as moot**.

**I. BACKGROUND**

Plaintiff Cabot Oil & Gas Corporation ("Cabot") is a Delaware corporation with its principal place of business in Houston, Texas. *Compl.* ¶ 1. On July 31, 2008, Plaintiff issued a solicitation letter to a number of organizations, including Defendant Daugherty Petroleum Industries ("DPI"),[1]

---

[1] The Court notes that since the filing of this case, DPI has changed its name to NGAS Production Co. It will nonetheless refer to the defendant under its prior name in this Opinion. DPI (continued...)

soliciting bids on its rights in and title to certain of its oil and gas leases. *Solicitation Letter*, Doc. 79-1. This letter invited DPI and other entities "to submit a preliminary bid or proposal to Cabot to purchase or develop the Leases." *Id.* Attached to the letter was a lease schedule and a map, which provided basic information about the leases.[2] *Id.* In response to the solicitation letter, DPI submitted a preliminary bid on August 15, 2008. *Preliminary Bid*, Doc. 79-2. DPI specifically conditioned its bid on a variety of factors, including: the form of consideration; due diligence during negotiations of an asset purchase agreement or purchase and sale agreement ("PSA"); an exclusivity period of sixty days, during which Cabot would remove the leaseholds from the market; and the successful negotiation of a mutually agreed-upon PSA. *Id.*

It is at this point the parties diverge in their interpretation of the facts. DPI characterizes its August 15, 2008 correspondence as a preliminary bid, with the expectation that the parties would negotiate a final contract. Specifically, DPI required a due diligence period with the exclusivity clause. Cabot views the August 15, 2008 communication as an offer, which it accepted when it responded to DPI on October 6, 2008,[3] thereby forming a binding contract. Regardless of how these communications are characterized, the following is not disputed. In its October communication,

---

[1](...continued)
is a Kentucky corporation, with its principal place of business in Kentucky. *Compl.* ¶ 2.

[2] The parties disagree as to whether the information attached to the solicitation letter was specific enough to allow DPI to know exactly which leaseholds it was bidding on. *See, e.g.*, *Def.'s Resp. & Opp'n to Pl.'s Mot. Summ. J.* 15–16, Doc. 85. DPI's description of the due diligence it expected to undertake, and the undisputed testimony of industry practices, undermine Cabot's position.

[3] DPI places significant emphasis on the seven week delay of Cabot's response to DPI's preliminary bid. DPI attempted to follow up with Cabot during this period, but Cabot decided to "hold [DPI] off" as it debated whether to go through with the deal. *See* Exs. 9 & 10 to *Def.'s Mot. Summ. J.*, Docs. 79-9 & 79-10.

Cabot stated "our desire to go directly to the [PSA] negotiation" which would provide for a due diligence period and other terms DPI had listed as conditions to its preliminary bid. *Oct. 6, 2008 Letter*, Doc. 79-3. Clearly, this order of steps to closing is materially different from DPI's "offer." DPI did not respond to Cabot, in spite of several attempts by Cabot to elicit a response, until Cabot sent a certified letter on November 19, 2008 wherein Cabot reiterated its acceptance of DPI's bid, and threatened to file a lawsuit to enforce the agreement. *Nov. 19, 2008 Letter*, Doc. 79-12. In its response email dated the same day, DPI reaffirmed the conditions upon its original offer, including a due diligence period and the successful negotiation of a mutually agreeable PSA. *Nov. 19, 2008 Email*, Doc. 79-13. DPI did, however, indicate it was willing to "commence due diligence upon the successful negotiation of a purchase and sale agreement." *Id.* Cabot sent a draft PSA (with new terms) to DPI on November 24, 2008; DPI never responded to this communication. *Pl.'s Mem. Supp. Mot. Partial Summ. J.* 5–6, Doc. 77. At some point during this period, Cabot took the leaseholds off the market, allegedly in response to DPI's request for an exclusivity period; Cabot, however, failed to inform DPI of this fact. *Id.* at 2–3.

When it became clear DPI was no longer interested in completing the purchase of the leasehold interests, Cabot filed the current action in the Circuit Court of Putnam County, seeking specific performance or, in the alternative, damages for breach of contract in the amount of $2,564,560.[4] *See Compl.* DPI removed the action to federal court on the basis of diversity jurisdiction. Both parties have submitted summary judgment motions. Plaintiff seeks partial summary judgment on the issue of liability as a matter of law, arguing that all the elements of a

---

[4] As the parties to this action are diverse, and the amount in controversy well exceeds the statutory threshold of $75,000, the Court **FINDS** it has subject matter jurisdiction. 28 U.S.C. § 1332(a).

contract formation have been established and that DPI breached the contract. In particular, Cabot argues it has failed to get the benefit of the bargain, and relied to its detriment on DPI's offer, as Cabot turned down other bids in expectation of the completion of a deal with DPI. Defendant seeks summary judgment as to all claims, asserting that a contract was never formed as its preliminary bid was never intended to serve as a contractual offer, but rather as the start of negotiations between it and Cabot. In the alternative, DPI asserts that Cabot's acceptance sought to change and modify DPI's offer; accordingly, no contract was formed as there was no mirror image offer and acceptance between the parties. As an alternative grounds for summary judgment, Defendant asserts that Plaintiff's claim is barred by the statute of frauds.[5] All motions have been fully briefed and are ripe for disposition.

## II. SUMMARY JUDGMENT STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). When cross-motions for summary judgment are filed, "the fact that both parties simultaneously are arguing that there is no genuine issue of fact does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." *Podberesky v. Kirwan*, 38 F.3d 147, 156 (4th Cir. 1994) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 2720 (2d ed. 1983)). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from

---

[5] As the Court finds this action can be decided on other grounds, it declines to reach the statute of frauds issue.

the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

In West Virginia, "[t]he fundamentals of a legal 'contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement." Syl. Pt. 5, *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (W. Va. 1926); *see also Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450 (W. Va. 1993) ("It is elementary that mutuality of assent is an essential element of all contracts.") (citing *Wheeling Downs Racing Ass'n v. W. Va. Sportservice, Inc.*, 216 S.E.2d 234 (W. Va. 1975)). A key determination in this case is whether there was mutual intent for DPI's preliminary bid to be considered as a contractual offer, to which Cabot's reply served as a full acceptance, or whether the communications between the parties were merely part of preliminary negotiations to reach a final contract for the sale of the leaseholds. *See, e.g.*, *Bailey*,

437 S.E.2d at 450–51. The West Virginia Supreme Court of Appeals has developed an analysis for cases such as these:

> "While a valid contract may be made between parties by memorandum, telegrams, and correspondence, care should be taken not to construe as an agreement that which the parties only intended to be a preliminary negotiation. The question in such cases is, Did the parties mean to contract by the memorandum of agreement, or were they only settling the terms of an agreement into which they proposed to enter after all its particulars were adjusted, which was then to be formally drawn up, and by which alone they designed to be bound? Such intention must necessarily be determined from the circumstances and surroundings appearing in each particular case."

*Blair v. Dickinson*, 54 S.E.2d 828, 844 (W. Va. 1949) (quoting *Virginian Exp. Coal Co.*, Syl. Pt. 4, 131 S.E. 253). The issue can be stated succinctly as, whether a final written draft is viewed "merely as a convenient memorial" of an already agreed to contract versus "the consummation of the negotiation." *Id.* at 844 (citations omitted). The West Virginia Supreme Court of Appeals identified factors that can aid in ascertaining which view was held by the parties. These factors include: whether the contract is of the type usually in writing; whether the contract needs to be a formal writing for its full expression; whether it has many or few details; whether the value of the contract is large; "whether it is a common or unusual contract"; and "whether the negotiations themselves indicate a written draft is contemplated as a final conclusion of the negotiations." *Id.* (citations omitted).

In this case, the business relationship between Cabot and DPI began with Cabot's solicitation letter, in which Cabot stated it was seeking "preliminary bid[s] or proposal[s]." *Solicitation Letter*, Doc. 79-1. The language in Cabot's solicitation letter provides significant support for DPI's characterization of the communications between the parties. Cabot communicated in its solicitation letter that those companies with successful preliminary bids would be contacted for "further discussion and negotiation." *Id.* With the language of the solicitation letter indicating a successful

bid would lead to future negotiation with Cabot, DPI's assertion that its preliminary bid was not a contractual offer is reasonable. This assertion is further supported by the number of contingencies and conditions DPI attached to its bid. *Preliminary Bid*, Doc. 79-2. Key among these conditions were DPI's requirement for the negotiation of a mutually agreed upon PSA and a due diligence period. Accordingly, with the bid letter, there were several outstanding issues to be negotiated by the parties before the parties could complete a binding contract.

The West Virginia Supreme Court of Appeals has recognized that where there is such a condition precedent, even where "all the terms of the contract have been agreed upon," a contract is not formed without the completion of the anticipated writing. *Blair*, 54 S.E.2d at 843 (citing *Brown v. W. Md. Ry. Co.*, Syl. Pt. 1, 114 S.E. 457 (W. Va. 1922)). Here, not only was there a condition precedent, but the parties failed to mutually assent to multiple terms of the contract. First, in Cabot's initial response to DPI's preliminary bid, it stated that it would like "to go directly to the Purchase and Sale Agreement negotiation which will provide [DPI] with a due diligence period and address [DPI's] other concerns." *Oct. 6, 2008 Letter*, Doc. 79-3. In contrast, DPI in its preliminary bid stated its wish to conduct due diligence while the PSA was being negotiated.[6] *Preliminary Bid*, Doc. 79-2. Further, Cabot's October 2008 letter made no mention of an exclusivity period[7] or the

---

[6] Cabot argues that DPI's November 19, 2008 email indicated a rescission of DPI's requirement that due diligence occur prior to the negotiation of a PSA. *Nov. 19, 2008 Email*, Doc. 79-13. While this might be the case, the November 19 email reasserts, as conditions of DPI's bid, the successful completion of a due diligence period and the execution of a mutually agreeable PSA. *Id.* Thus, even if the due diligence period could occur after the execution of a PSA, it was still a condition on DPI's "offer."

[7] Cabot asserts that it took the leaseholds off the market. *Pl.'s Mem. Law Supp. Mot. Partial Summ. J.* 13, Doc. 77. While this may be the case, there is no evidence that Cabot communicated this fact to DPI. *Def.'s Resp. & Opp'n to Pl.'s Mot. Summ. J.* 5–6, 7–8, 13, Doc. 85. Thus, this is
(continued...)

timing of the closing, which were also conditions to DPI's bid. *Compare Oct. 6, 2008 Letter*, Doc. 79-3, *with Preliminary Bid*, Doc. 79-2. Second, the draft PSA that Cabot eventually sent to DPI contained materially different terms from those contained in DPI's preliminary bid letter.[8] For example, the draft PSA called for an up front performance deposit of $659,986.75, *Draft PSA* § 2.03, Doc. 79-14, while the August 2008 preliminary bid specifically stated that DPI anticipated paying in full at closing, *Preliminary Bid*, Doc. 79-2.[9] On the basis of the foregoing, the PSA can best be characterized as the "consummation of the negotiation," rather than a "convenient memorial" as several key terms remained open for negotiation by the parties when Cabot submitted the draft PSA to DPI. *Blair*, 54 S.E.2d at 844.

This conclusion is affirmed by examining the contractual negotiations for the presence of the factors the West Virginia Supreme Court of Appeals found persuasive in *Blair*. As to the first,

---

[7](...continued)
another material term of the contract upon which there did not appear to be mutual understanding. *See, e.g.*, *Bailey*, 437 S.E.2d at 450.

[8] Cabot contends that the difference in terms in the draft PSA is of minimal import as Cabot's performance obligation under DPI's August 15, 2008 "offer" was to start the negotiations for a PSA between the parties. This argument, however, is based on a presupposition that a contract was formed following Cabot's October and November 2008 letters to DPI. As established in this Opinion, this is not the case. Contrary to Cabot's argument, the draft PSA is instead further evidence supporting DPI's assertion that the parties had yet to mutually assent to several key terms of the proposed agreement; accordingly, this Court cannot find a contract was ever formed between these parties. *See, e.g.*, *Bailey*, 437 S.E.2d at 450.. The significant differences between the draft PSA terms and the terms proposed by DPI also contradict Cabot's argument that all that remained for negotiation between the parties was the "boilerplate" language of the PSA.

[9] Cabot also argues that a promise to cooperate should be implied in the agreement between the parties, and that DPI violated its duty by failing to respond to the draft PSA. Cabot bases this argument on the principle that where the cooperation of a party is necessary for the performance of a promise, cooperation is an implied condition of a contract. *See, e.g.*, *Vanadium Corp. v. Fid. & Deposit Co.*, 159 F.2d 105, 108 (2d Cir. 1947). This can only be implied where a contract has been formed, which did not occur in this case.

second, and sixth factors, the proposed contract between the parties is of the type "usually found to be in writing," one that often required "a formal writing for its full expression," and the parties' negotiations indicate "a written draft [was] contemplated as a final conclusion of negotiations." *Blair*, 54 S.E.2d at 844. Both Cabot and DPI referred multiple times in their communications to the need for a mutually agreed-upon and executed PSA, and both parties indicated that a formal, signed PSA was a normal procedure for oil and gas deals. *See, e.g.*, *Dep. of Michael Walen* at 73–74, Doc. 79-4; *Dep. of William Barr* at 93, Doc. 79-5; *Dep. of Thomas S. Liberatore* at 97–99, Doc. 79-6. As to the third factor, the draft PSA sent to DPI by Cabot and the number of conditions DPI placed on its preliminary bid reflect the number of details the parties had to agree to in order to successfully close the contract. As to the fourth factor, the amount of the contract is large—$2,639,875. This analysis clearly sustains the finding that the written draft was to be "the consummation of the negotiation." *Blair*, 54 S.E.2d at 844.

As stated by the West Virginia Supreme Court of Appeals, "care should be taken not to construe as an agreement that which the parties only intended to be a preliminary negotiation." *Id.* When there is an indication that the parties intended to reduce a contract to writing—in this case the PSA—a presumption is created "that no final contract has been entered into, which requires strong evidence to overcome." *Id.* (citation omitted); *see also Sprout v. Bd. of Educ. of Cnty. of Harrison*, 599 S.E.2d 764, 768 (W. Va. 2004). Plaintiff has not met this burden. The Court cannot find that all the material terms of the contract were agreed upon by the parties. Further, the Court cannot find that both parties intended to bound by the communications, as DPI repeatedly insisted on the conditions to its preliminary bid. *Blair*, 54 S.E.2d at 844 ("If though fully agreed on the terms of their contract, they do not intend to be bound until a formal contract is prepared, there is no contract

. . . .") (citation omitted). No "acceptance" by Cabot could transform this preliminary bid into a binding offer, as the bid and the subsequent communications between the parties left several material terms of the proposed contract outstanding. As the parties were still in the midst of negotiations, either party was free to walk away from the negotiation process without legal penalty. *Virginian Exp. Coal Co.*, 131 S.E. at 261 (citing with approval *Ridgway v. Wharton*, 6 H. L. Cas. 268).

Even if the Court were to characterize the August 15, 2008 letter as an offer, it cannot find that there was a meeting of the minds between the parties. As detailed above, Cabot's October 6, 2008 "acceptance" and the draft PSA both contained materially different terms from DPI's preliminary bid letter. For an acceptance of a contractual offer to form a binding contract, the acceptance "must be unequivocal and unconditional and may not introduce additional terms and conditions not found in the offer." *John D. Stump & Assocs., Inc. v. Cunningham Mem'l Park, Inc.*, 419 S.E.2d 699, 705 (W. Va. 1992). Accordingly, any request for modification or change to a proposed contract is, in fact, a rejection of the offer. *Bowers Co. v. Kanawha Valley Prods. Co.*, Syl. Pt. 1, 130 S.E. 284 (W. Va. 1925). As the West Virginia Supreme Court of Appeals held:

> A party to whom an offer of contract is made must either accept it wholly or reject it wholly. A proposition to accept on terms varying from those offered is a rejection of the offer, and a substitution in its place of the counter proposition. It puts an end to the negotiation so far as the original offer is concerned.

*Id.* at Syl. Pt. 2. Where changes or modifications are proposed, it "is then as if the original offer had not been made, so far as any rights or liabilities can arise therefrom." *Id.* at 286 (citations omitted).

Here, Plaintiff, in each communication to Defendant, included terms that differed from the initial August 15, 2008 "offer" letter. In no communication did Defendant wholly accept the August

2008 offer's conditions,[10] and even when it sought to negotiate a PSA with DPI, the terms differed from the August 15, 2008 preliminary bid letter. *Compare Preliminary Bid*, Doc. 79-2, *with Oct. 6, 2008 Letter*, Doc. 79-3, *and Draft PSA*, Doc. 79-14. Accordingly, even if the Court were to find the August 15, 2008 was a contractual offer, there was no acceptance of the offer as Cabot sought to make changes to the terms as offered by DPI.

"A meeting of the minds of the parties is a *sine qua non* of all contracts." *Sprout*, Syl. Pt. 4, 599 S.E.2d 764 (citations omitted). There was no meeting of the minds on multiple key material terms, including the PSA, the exclusivity period, the due diligence period, and the form and manner of payment. At best, the parties were in negotiations to enter into a binding contract. Further, even if DPI had made a contractual offer, Cabot never made a "mirror image" acceptance. Accordingly, the Court **FINDS** that no contract was formed between the parties.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**, Plaintiff's motion for partial summary judgment is **DENIED**, and Defendant's motion in limine and motion to strike jury demand are **DENIED as moot**. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: March 23, 2011

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[10] Cabot also sent an additional letter date November 19, 2008, which it characterizes as an unconditional acceptance of DPI's "offer." *Nov. 19, 2008 Letter*, Doc. 79-12. This letter does no more than incorporate the October 6, 2008 letter as the basis for its acceptance. Thus, all the shortcomings of the October 6, 2008 letter apply equally to the November 19, 2008 letter.